UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PLAINTIFF JUSTINE LEONARDO, on Behalf of Herself and All Others Similarly Situated, | ) ) ) ) ) | Case No.: 1:09-cv-01588 <br><br> <u>CLASS ACTION</u> <br><br> FIRST AMENDED COMPLAINT |
| Plaintiff, | ) ) ) | |
| vs. <br> HEALTH CARE SERVICE CORPORATION, | ) ) ) ) ) | |
| Defendant. | ) ) ) ) | |

Plaintiff Justine Leonardo, by and through her undersigned attorneys, based on her individual experiences and the investigation of counsel, alleges on behalf of herself and on behalf of the proposed plaintiff Class as defined herein against Health Care Service Corporation as follows:

## <u>SUMMARY OF THE CASE</u>

1.      This individual and proposed class action seeks unpaid benefits and equitable relief, pursuant to the Employee Retirement Income and Security Act of 1974 ("ERISA"), arising from Health Care Service Corporation's systematic under-reimbursement of its group health members for "out-of-network" health care services and from other breaches of its obligations under ERISA.

2.      During all times relevant to this Complaint, Plaintiff was a member of a group health plan insured and administered by HCSC.  Plaintiff was formerly a member of a fully insured ERISA HCSC group health plan provided through her employer.

3.      Health Care Service Corporation ("HCSC") is America's fourth largest health insurer. (http://www.hcsc.com/about-hcsc/about-hcsc.html (last viewed February 4, 2009).) HCSC insures, pays and administers commercial health benefits, including those of Plaintiff, in Illinois, Texas, New Mexico and Oklahoma.

4.      HCSC is an ERISA fiduciary as to all of its insured members because it has discretionary authority to decide claims for benefits and, in fact, does so.  In deciding claims for benefits, HCSC, creates, establishes, and implements all procedures for benefit claims processing and handling.   HCSC is the final decision-maker with respect to paying claims for health benefits for (or to) its group plan members.  As it is legally obligated to do, HCSC pays from its own funds health care benefits for (or to) its group health plan members.  HCSC is the only entity that pays benefits for (or to its) group health plan members.

5.      Like many other health insurance companies, HCSC permits its members to receive health care services either from providers who have contracted with HCSC to provide services at discounted rates ("in-network" providers) or to use non-contracted ("out-of-network") providers.

6.       In order to receive the option to use out-of-network providers, extra premiums must be paid.  In exchange for those premiums, HCSC promises to provide certain benefits and services to its members related to out-of-network health care.  As set forth more fully below, HCSC broke its agreement with Plaintiff and the class members in violation of ERISA by under-reimbursing them for out-of-network medical, surgical, dental and other services (including, but not limited to, anesthesia, lab work, durable medical equipment, pharmaceuticals, chiropractic and acupuncture, therapy and other necessary care), and by breaching other obligations under ERISA.

7.      The reimbursements that Plaintiff and the class members received were less than the amounts that HCSC was contractually obligated to pay for out-of-network services. Although Plaintiff and the class members were entitled by contract with HCSC to obtain medical services from providers who do not participate in HCSC's network (so-called out-of-network providers), HCSC discouraged the use of out-of-network providers by, among other things, improperly lowering out-of-network reimbursements and thereby increasing unpaid amounts for which Plaintiff and other HCSC members are financially responsible.

8.      When HCSC members receive out-of-network services, HCSC paid its members the lesser of the billed charge or the usual, customary and reasonable ("UCR") amount for that service.

9.      HCSC often refers to UCR as the "allowed amount," the "allowable amount," the "allowed charge," or the "allowable charge."[1]  HCSC states in communications with HCSC members that its members are financially responsible for any difference between UCR (the so-called "allowed charge") and the provider's actual (billed) charge for out-of-network services.

10.     HCSC's Evidences of Coverage ("EOC") state that the HCSC Member is financially responsible for any part of a charge of this sort above the UCR amount determined by HCSC.  How HCSC determines UCR is thus a critical component of each member's health benefits.

11.     HCSC improperly reduces its members' out-of-network reimbursements by using databases that are owned and operated by a third party, Ingenix, Inc. ("Ingenix").  Ingenix is owned by America's largest health insurance company, UnitedHealth Group. These databases are known as the Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR") (collectively, "Ingenix databases"). These databases are fundamentally flawed and do

---

[1] Hereinafter, Plaintiff refers to the amount simply as UCR or UCR amount.

not accurately reflect actual prevailing charges for health care services. Nonetheless, HCSC uses these databases as a reimbursement rate-setting tool to the detriment of its members.

12.     HCSC has breached its obligations under ERISA by using the Ingenix databases to make UCR determinations. HCSC uses the Ingenix databases to define UCR and thus determine reimbursement rates on out-of-network health care claims even though the databases are inherently flawed and invalid for UCR and systematically skew UCR amounts downward, causing financial losses to Plaintiff and others like her, as well as increasing revenues for HCSC. The flaws in the Ingenix data are alleged with particularity below.

13.     During the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network claims when it knew or should have known that Ingenix had manipulated its databases by deleting from its data sets valid "high" charges by health care providers and deleting proportionately more "high" charges than "low" charges.

14.     During the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network claims when it knew or should have known that Ingenix deletes from its databases provider charges that with so-called health care claims coding "modifiers," which indicate procedures or services with special complications. Health care provider charges featuring such modifiers are usually higher than provider charges without modifiers. During the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network services when it knew or should have known that Ingenix pools data for its databases from dissimilar providers (such as nurses, physician assistants and physicians).

15.     During the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network services when it knew or should have known that

Ingenix fails to audit the data it receives from data contributor health plans to ensure that the health plans have submitted all appropriate data and that they have not improperly reported to Ingenix for use in its databases negotiated or discounted rates that providers have charged for health care services rather than charges actually billed by providers.

16.     During the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network services when it knew or should have known that some Ingenix data contributors delete "high" provider charges for health care services from the data they submit to Ingenix for use in the Ingenix databases.

17.     During the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network services when it knew or should have known that Ingenix used a deficient methodology to "derive" additional provider charges in the databases beyond the charges actually reported by Ingenix data contributor health plans to Ingenix. Ingenix's use of defective data to "derive" such additional provider charges caused the resulting rates to be defective and improper for use in setting reimbursements for health care services.

18.     In sum, during the Class Period, HCSC improperly used the Ingenix databases to set reimbursement rates for out-of-network services when it knew or should have known that these databases were flawed in the aforementioned ways and thus that these databases, when used as a reimbursement tool by HCSC, predictably and improperly would result in adverse benefit determinations damaging Plaintiff and other HCSC Members.

19.     "Adverse benefit determination" is an ERISA term of art that is used when an insurance payor such as HCSC makes a decision to deny, reduce, terminate or not pay for all or part of a health benefit. An adverse benefit determination is a denial of benefits. When HCSC determines whether or not to pay for out-of-network medical services, it must do so consistent

with its fiduciary duties under ERISA, which include adherence to the terms of the plan (which is the insurance contracts with its members) and acting solely in the interest of its members.

20.     As shown here, HCSC's out-of-network adverse benefit determinations to Plaintiff and the Class violated HCSC's obligations under ERISA.  Plaintiff and the Class seek payment of unpaid amounts caused by HCSC's out-of-network adverse benefit determinations, together with interest dating from the date of the original out-of-network adverse benefit determinations at issue and other appropriate equitable relief to remedy HCSC's breach of its health care contracts and violation of its fiduciary duties under ERISA, including injunctive relief requiring HCSC to discontinue the use of Ingenix databases.

## JURISDICTION AND VENUE

21.     ERISA governs the rights and duties of insurance companies and HCSC members of employer sponsored health care plans. 29 U.S.C. § 502, 29 U.S.C. § 1132. This Court has jurisdiction under 29 U.S.C. § 502(e) and 29 U.S.C. § 1132(e).

22.     Venue is appropriate here for Plaintiff's ERISA claims because (i) HCSC resides, is found, has an agent, and transacts business in this district and (ii) HCSC conducts a substantial amount of business in this district and insures and administers group health plans here.  HCSC is "found" in this District because it maintains its headquarters at 300 East Randolph Street, Chicago, Illinois 60601.  HCSC administers group health plans in this District because, on information and belief, HCSC maintains the data centers and operating systems used by its BlueCross BlueShield Divisions (Illinois, New Mexico, Oklahoma, and Texas) to process and decide claims for benefits in this District.

23.     **Plaintiff Justine Leonardo.** Plaintiff is a resident of Novato, California. She formerly worked for a law firm in Texas named Brent Coon & Associates. Incident to her employment there, Plaintiff received group health insurance from HCSC via its BlueCross BlueShield of Texas division. That group health coverage is subject to ERISA. During all relevant times, Plaintiff was a member of this group health plan insured and administered by HCSC. The name of the plan is Brent Coon & Associates health plan, Group Plan Number 014587-0006-000843329213. This health plan is a group insurance policy issued by HCSC division BlueCross BlueShield of Texas. HCSC, through this division, insures the benefits under the Plan, pays the benefits under the Plan, and makes all decisions about eligibility, coverage, and payment of benefits. Neither the plan nor the employer has any role in the aforementioned process. The "Certificate of Group Creditable Coverage" issued by BlueCross BlueShield of Texas to Plaintiff identifies BlueCross BlueShield of Texas as the "plan administrator or issuer responsible for providing this Certificate."

24.     As a result of HCSC's claims procedures and adverse benefit determinations, Plaintiff and the Class received reimbursements that are less than the amount HCSC was obligated to pay for out-of-network services.

25.     **Defendant Health Care Services Corp.** HCSC is a Mutual Legal Reserve Company headquartered in Chicago, IL. It has 59 offices in Illinois, Texas, New Mexico, Oklahoma, Ohio and Colorado, including its headquarters office in this District. HCSC has approximately 12.4 million members or insureds. It offers health insurance products through its divisions BlueCross BlueShield of Illinois, BlueCross BlueShield of New Mexico, BlueCross BlueShield of Oklahoma, and BlueCross BlueShield of Texas. According to its financial

statement, HCSC underwrites and administers health and dental insurance business in Illinois, New Mexico, Oklahoma, and Texas and does business in those states, respectively, as BlueCross BlueShield of Illinois, BlueCross BlueShield of New Mexico, BlueCross BlueShield of Oklahoma, and BlueCross BlueShield of Texas. These BlueCross BlueShield divisions are consolidated within HCSC; that is, they are wholly owned by HCSC and not separately incorporated.

**GROUNDS FOR RELIEF**

26.     Like other HCSC plans described above, Plaintiff's group health plan permitted Plaintiff to choose out-of-network doctors for health care.

27.     Plaintiff in 2008 sought and received out-of-network medical services while insured by HCSC. Over a period of months, she received various diagnostic tests and therapies. Some of these services were out-of-network.

28.     In 2008, HCSC made at least one out-of-network/UCR benefit determination adversely to Plaintiff through use of the Ingenix databases. Plaintiff has incurred tangible financial losses due to HCSC's Ingenix-related adverse benefit determinations.

29.     Plaintiff appealed this adverse benefit determination to HCSC in accordance with its contractually established appeal procedures.  HCSC denied Plaintiff's appeal of this claim underpayment. Plaintiff has thus exhausted her available administrative remedies concerning HCSC's adverse benefit determinations.

30.     Plaintiff, through counsel, sought all records pertaining to her benefit determination. Plaintiff requested all documents, information, and materials submitted, considered, or generated in the course of investigating, evaluating, and deciding her claim. Further, her counsel traveled to Richardson, Texas, where, BlueCross and BlueShield of Texas

said that Plaintiff and/or her legal representatives may review her claims file. On January 23, 2009, Plaintiff's counsel appeared in Richardson and there informed employees of HCSC that he intended to review her claims file pursuant to Plaintiff's plan documents. There Plaintiff's counsel was informed that Plaintiff's records were not at the location designated by BlueCross BlueShield, but, instead, were located in Marshall, Texas. Plaintiff's counsel then requested from HCSC a copy of Plaintiff's claims file. As of the date of filing the original complaint, HCSC had not provided these records or any other documents, information, and materials submitted, considered, or generated in the course of investigating, evaluating, and deciding Plaintiff's claim.

31. HCSC's defense counsel provided some but not all of these requested documents after she filed her original complaint against HCSC. HCSC's defense counsel did not provide a copy of the Plan document or evidence of coverage, or the Ingenix data used to decide Plaintiff's claim.

## HCSC'S BREACH OF CONTRACT AND VIOLATION OF ITS ERISA FIDUCIARY OBLIGATIONS

32. Upon enrollment in HCSC's health plans, Plaintiff and the Class received and entered into a contract called an Evidence of Coverage. The Evidence of Coverage sets forth the terms of Plaintiff's health plan and the benefits Plaintiff and members of the Class are entitled to receive from HCSC.

33. The Evidence of Coverage provides that HCSC Members are entitled to benefits based on UCR when they use out-of-network providers.

34. The Evidence of Coverage provides that Members are responsible for any amount billed by an out-of-network health care provider that exceeds the UCR amount set by HCSC for out-of-network health care services and procedures.

35.     For the reasons set forth here, HCSC has breached the Evidence of Coverage in adjudicating benefit claims made by Plaintiff and Class Members.

36.     HCSC is a fiduciary for Plaintiff and the Class because it decides claims for benefits. *Ruiz v. Continental Casualty Co.*, 400 F.3d 986 (7th Cir. 2004).

37.     HCSC is obligated to abide by the specific contractual provisions of group health plans, including Plaintiff's group health plan, under ERISA.

38.     HCSC may not apply any out-of-network adverse benefit determinations if they are not authorized or disclosed in a HCSC Member's Evidence of Coverage.

39.     As an ERISA fiduciary, HCSC is obligated to tell HCSC Members about the legal requirements affecting their benefits entitlements; HCSC systematically fails to do this.

40.     As an ERISA fiduciary, HCSC is obligated to fully inform HCSC members of material facts related to their benefits and must comply with federal regulations governing claims procedures both as to initial claim denials and appeals.  HCSC does not do so.

41.     HCSC auto-adjudicates and makes adverse benefit determinations for out-of-network claims based on the Ingenix databases either without knowing the data or the methodology used by Ingenix to describe supposedly prevailing health care charges or, alternatively, with the knowledge that Ingenix's data is flawed and/or that its methodology for describing supposedly prevailing health care charges is flawed.

42.     HCSC fails to provide UCR data when requested, in violation of federal law.

43.     HCSC fails to advise HCSC members about the disclaimer Ingenix applies to its database, which by its terms prohibits the direct use of the Ingenix databases as an insurance payor's UCR standard, as explained below.  HCSC auto-adjudicates out-of-network claims (and auto-adjudicated Plaintiff's out-of-network claim) using the Ingenix databases in violation of this

prohibition. Furthermore, HCSC misrepresents the nature, accuracy, function and source of the Ingenix data to its members.

44.     HCSC failed to provide a "full and fair review" of claims determinations to Plaintiff and other HCSC members, and HCSC's appeals process therefore violates federal employee benefits law.

45.     HCSC systematically under-pays claims for benefits using Ingenix data so that it can increase its profits.

46.     Plaintiff challenges HCSC's application of rules and policies in making out-of-network adverse benefit determinations that are not authorized by Evidences of Coverage, and challenges Defendant's violation of its fiduciary duties and its routine failure to comply with ERISA.

**UCR AND THE INGENIX DATABASES**

47.     HCSC uses the Ingenix databases to make UCR determinations. HCSC obtains Ingenix data from Ingenix and loads the data onto its internal claims-processing platforms. HCSC's claims processors access that data and resolve claims automatically in a process called auto-adjudication.

48.     Ingenix produces two cycles of Ingenix data a year, which include medical, surgical, anesthesia, and dental data and Health Care Financing Administration data concerning common procedure coding system services ("HCPCS").

49.     The Ingenix databases are purportedly designed to collect and report actual charge data by health care providers for out-of-network health care services from which UCR amounts can be determined.  For some services, the Ingenix databases feature "derived data."  Derived data uses relative values and averages charges for a number of procedures in the same "bodily area" as the procedure for which a derived amount is calculated.

50.     The Ingenix databases are based on charge data contributed to Ingenix by health plans, like United Healthcare (the parent company of Ingenix) and other insurance payors (which also use the final published data to price out-of-network claims as UCR).

51.     Ingenix extensively edits the charge data contributed by these data contributors, skewing the data downward to make it appear as if the amounts health care providers actually charge patients for health care services are much lower than they actually are. Further, data contributors – that is, health insurers like HCSC – extensively pre-edit the charge data prior to sending the data to Ingenix and contribute less-than-complete data to Ingenix, causing further downward skewing of the data to the detriment of health plan members like Plaintiff who obtain out-of-network health services covered by Ingenix-using health plans like HCSC.  HCSC knew or should have known of these defects in the Ingenix data.

52.     HCSC has breached its Evidences of Coverage (including Plaintiff's) and its fiduciary duties under ERISA by using the Ingenix databases to make UCR determinations. HCSC uses the Ingenix databases to price UCR even though they are inherently flawed and invalid and are an inadequate and improper basis for UCR determinations.

53.     The Ingenix databases do not reflect the fees "billed by a majority of Physicians" because, among other things, (i) Ingenix does not determine the number of physicians or other providers in a given geographic region; (ii) Ingenix does not determine whether the data comes from physicians or non-physicians; and (iii) the charges collected for a procedure described in the Ingenix databases could in fact all possibly come from a ***single provider***.  The "complexity or severity" of a "specific case" is not determined or accounted for in the Ingenix databases. Ingenix edits out all charges submitted with the claims code modifier indicating increased complexity.

54.     Moreover, Ingenix does not collect its own billing data and does not verify the accuracy of the data it receives.

55.     Ingenix receives date from health insurance companies who volunteer data about the amounts that happen to have been billed by an undisclosed number of unidentified healthcare providers for specific CPT code services. Ingenix does not even regularly audit the quality of the data it receives.

56.     The data received by Ingenix does not identify the providers, the total number of providers whose charges make up the database for a given CPT code at any given time, or purport to even represent all the provider bills received for a given procedure by a given health insurance company in a given reporting period. Nor does Ingenix attempt to determine whether the billed charges for a given provider for a given procedure are the given provider's usual and customary charge or, instead, a discounted rate under a network contract.

57.     Whenever HCSC uses the Ingenix databases as the method to determine UCR, HCSC relies on the Ingenix data and gives no consideration to the increased severity or complexity of a specific case in determining reimbursement for the health care services in question. HCSC systematically failed to disclose this critical information to Plaintiff and other HCSC Members and to health care providers and regulators.

58.     Ingenix informed its data users (such as HCSC) that it does not endorse, approve or recommend the use of Ingenix data for UCR. Ingenix data is produced with the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied 'reasonable and customary' charge (either actual or derived). . . . Any interpretation and/or

use of the data by the subscriber is solely) and exclusively at the discretion
of the subscriber.

Ingenix also informed data users (including HCSC) that they cannot "represent" the Ingenix data **other than** as described in the disclaimer.

59.     HCSC was aware of this disclaimer but failed to advise its HCSC Members of the disclaimer and both used and represented the Ingenix data inconsistently with the disclaimer.

60.     By systematically making UCR determinations without valid data to justify reimbursing Plaintiff and others amounts for out-of-network health services that are less than the actual amounts billed by out-of-network health care providers, HCSC has violated its obligation to comply with Evidences of Coverage upon which Plaintiffs and other HCSC Members are entitled to rely.

61.     Courts and government agencies have found the Ingenix data to be flawed. As one court explained, Ingenix's data is not reliable or accurate and its statistical extrapolations are flawed:

> Ingenix relies on its "data contribution program" in which some, but not all, of only those health insurers that are Ingenix clients submit information, on a purely voluntary basis, about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific CPT code services. While Ingenix requires those of its health insurer clients that elect to participate to certify that the number and amount of the CPT code billings they submit are accurate, there is no Ingenix mechanism to enforce or validate the client certificates. Although [the] Ingenix Manager of Research and Development, mentioned occasional audits by Ingenix of the data it receives, she had no knowledge of when such an audit had last been made. Indeed, Ingenix itself prints the following disclaimer on its products: "The database is provided for informational purposes only and Ingenix disclaims any endorsement, approval or recommendation of data in the database."

> Further, the billing data volunteered by some of its clients to Ingenix lists only the medical service CPT code number, the bill amount, the date of the service, and the provider's zip code. The data does not name, or otherwise identify, the medical providers who billed Ingenix insurer clients and whose bill amounts were then passed along to Ingenix. Nor does the information disclose the total number of providers whose charges may make up the Ingenix database at any point.

Ingenix cannot guarantee that all of the bills received for a particular CPT code service at any given time have been reported, much less accurately reported, by its volunteer insurers. Nor can Ingenix ascertain if the bills that are listed constitute the unnamed providers' usual and customary charges for the service, or, instead, a discounted rate required by the agreements one or more of the providers may have had with health care insurers. While Ingenix requests that the CPT code billing data be accurate and complete, [the] Ingenix Manager of Research and Development conceded at trial that Ingenix remains "at the mercy" of its voluntary data contributors with respect to that result.

***

Ingenix analyses [are] supposed to permit the [insurance carrier] to compare [a provider's] professional rates with other health providers' bills for the same services in [the provider's] geographical area. [The Ingenix Manager of Research and Development] concede[s], however, that the Ingenix database does not include data on the total number of times a particular CPT code service was actually performed in a given area at any time, or what the actual dollar range of provider fees was for the service. [The Ingenix Manager of Research and Development has] testified that Ingenix billing data is neither a "universal sample" of professional services and charges, nor even a random sample of what other professionals were charging for [a given] CPT code … at the time…. At best, the Ingenix database includes the bills of an unspecified number of medical providers who, within a specific period of time, happened to have billed only those health insurers that were not only Ingenix clients, but also Ingenix clients that elected to participate in its voluntary data contribution program. Thus, an Ingenix statistical conclusion as to the specific dollar amount of, for example, the 80th percentile of billings for manual therapy, was not evidence of the 80th percentile of actual charges for that service in [the provider's] area. The conclusion is, instead, proof of nothing more than the amount of the 80th percentile of only those charges that happen to be included in Ingenix's particular database. As stated, it is unknown how many providers' bills for an initial examination or manual therapy may have been included in the Ingenix database at the time of … treatment, or at any given point. Thus, the Ingenix materials … did not constitute evidence of the dollar amount of the usual and customary charges in [the provider's] area for the services he provided, much less proof of what could be considered fair and reasonable charges for those services.

*Davekos v. Liberty Mut. Ins. Co.*, 2008 WL 241613 (Mass.App.Div. Jan. 24, 2008), Exhibit A

hereto.

62.     The widespread flaws in the Ingenix data led to several investigations by the

Attorney General of New York. A report prepared by the New York Attorney General found that

insurers using Ingenix data systematically underpaid claims by insureds and engaged in rampant

conflicts of interest. In New York, for example, Ingenix databases understate the market rate of ordinary doctor's office visits by 28%, which "translates to at least hundreds of millions of dollars in losses for consumers over the past ten years across the country." *Health Care Report: The Consumer Reimbursement System is Code Blue*, State of New York Office of the Attorney General (Jan. 13, 2009) ("*Report*") at 2, Exhibit B hereto.

63. The Report continues:

[T]he out-of-network system is broken. Insurers mislead and obfuscate their policy language. They promise to reimburse based on usual and customary rates – a form of market rate – but then reimburse based on schedules compiled by one of their own, the nation's second largest health insurer, which has an interest in depressing reimbursement rates. They hide this conflict of interest from their members. They pretend an independent database underlies these rates – it does not. Our investigation found that the Ingenix schedules themselves, created in a well of conflicts, are unreliable, inadequate, and wrong – usually at the expense of the consumer.

*Report* at 2-3.

The current industry model for reimbursing out-of-network care is fraudulent. The industry uses a conflict-laden database riddles with errors at the expense of the consumer. The database is neither independent nor fair. This leads to chronically flawed decisions. Given the heavy burden of health care costs that working families must bear when insurers fail to pay what they owe, the out-of-network system must be fixed.

*Report* at 6-7.

64. The Attorney General of New York investigated over a dozen of the largest health insurance companies doing business in New York, including several Blue Cross Blue Shield entities. Among other things, he found that no insurers disclosed that a major health insurer, UnitedHealth Group, owns and operates the Ingenix databases and that health plan terms and language were routinely confusing. *Report* at 17-18.

65. The Attorney General also studied the accuracy of the Ingenix databases. The process involved analyzing millions of health care bills from various sources to determine the

amount actually charged by providers versus the amount the Ingenix databases stated was usual and customary for a service in a given geographical area. The analysis revealed that insurers using Ingenix systematically under-reimbursed members for out-of-network services by approximately 28%. *Report* at 19-20.

66. Eleven health insurance companies doing business in New York each entered into an Assurance of Discontinuance pursuant to which the company agreed, among other things, to discontinue using Ingenix databases except as mandated by law. Even Ingenix's parent, United Health Group Inc., agreed to stop using Ingenix databases and to support the development of new database for out-of-network claims.

67. On June 24, 2009, the Office Of Oversight And Investigations of the United States Senate Committee On Commerce, Science And Transportation issued a report entitled *Underpayments To Consumers By The Health Insurance Industry*, Exhibit C hereto. That report states bluntly that the Committee "ha[s] determined that in every region of the United States, large health insurance companies have been using two faulty database products owned by Ingenix, Inc., to under-pay millions of valid health insurance claims. The companies have used these Ingenix database products without providing even the most basic information about them to consumers or health care providers." *Report* at i.

68. The Senate report further notes that "[o]ver the past several years, a succession of private lawsuits and government investigations has revealed that **the largest health insurance companies in the United States have been under-reimbursing their customers for out-of-network health care services. While insurance carriers have been promising to provide their customers with a certain level of coverage, they have actually been paying out-of-network claims at a lower level. The result of this practice is that American consumers have paid**

*billions of dollars for health care services that their insurance companies should have paid.*"
*Id.* (emphasis added).

## HCSC FAILS TO PROVIDE FULL AND FAIR REVIEW OF CLAIMS

69.     HCSC functions as a claims administrator, a plan administrator, and fiduciary within the meaning of ERISA for Plaintiff and the class members in that it creates, implements and controls the claims administration process and exercises full discretionary authority over all claims and benefits.  Plaintiff and the class members are therefore entitled to receive a "full and fair review" of all claims decided by HCSC.  HCSC decides how much to pay members for out-of-network services.

70.     Although HCSC was obligated to do so, HCSC failed to provide a "full and fair review" of denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiff and the Class by making out-of-network benefit determinations that are inconsistent with the terms of Plaintiff's' Evidence(s) of Coverage, by failing to disclose the "specific reasons" for out-of-network benefit determinations, as well as by failing to disclose data and/or the methodology it relied on in making out-of-network benefit determinations.

71.     Specifically, HCSC did not and does explain or disclose to is members the use of invalid Ingenix data.  HCSC did not provide to Plaintiff (or any other class member) the Ingenix data that it relied on in deciding Plaintiff's claims.

72.     HSCS does not disclosure its use of Ingenix data in evidences of coverage or group policies.  It does not tell its members that it uses Ingenix to decide out-of- network claims.  HSCS conceal its use of Ingenix by not providing Ingenix data in response to member requests for information used to decide a claim for benefits.

73. HCSC's use of inherently and deeply flawed database, as described above, was and is a systemic and widespread failure in claims administration. HSCS adopted the use of Ingenix for the purpose of retaining for itself benefits payments owed to its members.

74. Plaintiff and the class members have been harmed by HCSC's failure to provide a "full and fair review" of appeals submitted by Plaintiff and the class members under ERISA § 503, 29 U.S.C. § 1133, and by HCSC's failure to disclose information relevant to HCSC members benefits in violation of ERISA.

## CLASS ACTION ALLEGATIONS

75. Plaintiff brings this action on her own behalf and on behalf of a class defined as:

> All persons in the United States who are, or were members in any employer welfare plan insured and administered by HCSC and subject to ERISA who received medical services or supplies from an out-of-network provider and received reimbursement that was less than the provider's billed charge.

76. Plaintiff brings ERISA claims against HCSC on her own behalf and on behalf of the Class to recover benefits due Class members under the plan, to enforce and clarify their rights under ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B), and to remedy HCSC's failure to provide a "full and fair review" of the decisions denying claims under ERISA § 503, 29 U.S.C. § 1133. Further, the Class alleges that HCSC is a fiduciary that has violated its fiduciary duty of loyalty and care under ERISA §§ 404(a)(1)(B) and (D), by relying, among other things, on Ingenix databases that are invalid for the purpose of determining UCR reimbursement, by making out-of-network adverse benefit determinations that systematically reduced reimbursement without any supporting disclosure or contractual authority and by failing to provide required data and other information to HCSC members.

77.     HCSC has violated its fiduciary duties of care and loyalty to its HCSC members by using undisclosed reimbursement rules that are unauthorized by a HCSC member's Evidence of Coverage. HCSC made misstatements to HCSC members that were intended to, and/or did in practice, discourage HCSC members from understanding the claims adjudication basis used in HCSC's out-of-network adverse benefit determinations.

78.     HCSC acted and continues to act as an adversary to its HCSC members, in violation of its fiduciary obligations to them.

79.     HCSC discouraged claims appeals by its members by providing insufficient information about its out-of-network adverse benefit determinations and by failing meaningfully to tell HCSC members about their appeal rights.

80.     The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Class consists of hundreds of thousands of employees and their dependents who are participants and HCSC members in group health plans insured, offered or administered by HCSC. The precise number of members in the Class is within HCSC's sole custody and control.  Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class.

81.     Common questions of law and fact include:

- Whether HCSC is a fiduciary;

- Whether HCSC calculated Class members' out-of-network benefits accurately when it used Ingenix;

- The standard of review applicable to HCSC's adverse benefit determinations;

- Whether HCSC had a conflict of interest when deciding claims for out-of-network benefits;

- Availability of injunctive relief;

- Availability of monetary equitable relief such as disgorgement.

82. The named Plaintiff's claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, HCSC has breached its statutory and contractual obligations to Plaintiff and the Class through and by a uniform pattern or practice as described above.

83. The named Plaintiff will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action and ERISA litigation and has no interests antagonistic to or in conflict with those of the Class. For these reasons, the named Plaintiff is an adequate class representative.

84. The prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for HCSC as to the Class.

85. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the harm done to them. Given the uniform policies and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

86. Common fact and legal issues exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including those class claims, issues and defenses listed above.

# CLAIMS FOR RELIEF

## COUNT I

### CLAIM FOR BENEFITS
### UNDER ERISA § 502(a)(1)(B)

87.     The allegations contained in this complaint are realleged and incorporated by reference as if fully set forth therein.

88.     HCSC is liable for a breach of its obligations to pay HCSC members whose health plans are insured by, funded by or administered by HCSC pursuant to the terms of their group health plans.  HCSC breached the HCSC members' contracts of insurance known as Evidences of Coverage by using flawed and invalid Ingenix databases to calculate UCR and is liable to HCSC members whenever HCSC (or its third party vendors) determined UCR based on such data.

89.     Each and every time HCSC calculated UCR using Ingenix data that was also outdated, HCSC violated Plaintiff's Evidences of Coverage, all of which explicitly or by operation of law prohibit the use of outdated data to calculate UCR.  In addition, the use of outdated data by HCSC violates ERISA.

90.     Plaintiff is owed interest back to the date her claims were originally submitted for all out-of-network adverse benefit determinations that were not contractually authorized by her Evidence(s) of Coverage and that improperly reduced her reimbursements.

91.     Plaintiff and the Class are entitled to wrongfully denied benefits and/or restitution from HCSC, as well as declaratory and injunctive relief related to enforcement of the terms of Plaintiff's health plan, and to clarify future benefits.  HCSC is liable to Plaintiff and the Class for unpaid benefits, interest, attorneys' fees, and such other penalties as this Court deems just, under ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).  In addition, Plaintiff and the Class seek costs,

prejudgment interest and other appropriate equitable relief, including the issuance of appropriate declaratory and injunctive relief against HCSC.

**COUNT II**

**BREACHES OF FIDUCIARY DUTY UNDER
ERISA § 404 IN CONNECTION WITH
SYSTEMIC FAILURES IN CLAIMS PROCESSING**

92.     The allegations contained in this complaint are realleged and incorporated by reference as if fully set forth herein.

93.     HCSC acted as a fiduciary to Plaintiff and the Class in connection with HCSC Members' group health plans, as such term is understood under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

94.     Section 502(a)(3), 29 U.S.C. § 1132(a)(3), allows Plaintiff to sue a fiduciary for appropriate equitable relief.  Reformation of claims processing procedures and disgorgement are appropriate relief under section 502(a)(3) because such relief may not be available under section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

95.     As a fiduciary of group health plans under ERISA, HCSC owes HCSC Members in such plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of an enterprise of like character. Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan. ERISA § 404(a)(1)(B) and (D), 29 U.S.C. § 1104(a)(1)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, HCSC violated its fiduciary duty of care.

96.     HCSC violated its fiduciary duty of loyalty by knowingly using flawed Ingenix data to routinely make out-of-network adverse benefit determinations that were unauthorized by Evidences of Coverage and other group health plan materials and that benefited HCSC at the

expense of HCSC members. HCSC also failed to inform HCSC members of flaws in the Ingenix databases that make their use inappropriate to calculate UCR reimbursement.

97.     Plaintiff is entitled to assert a claim for relief for HCSC's violation of its fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including disgorgement, restitution, injunctive and declaratory relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in her favor against Defendant as follows:

A.     Declaring that HCSC has violated its fiduciary duties including the duties of loyalty and care to Plaintiff and the Class, and awarding appropriate relief;

B.     Declaring that HCSC has breached the terms of its Evidences of Coverage and other group health plan documents and awarding unpaid benefits to Plaintiff and the Class, as well as awarding injunctive and declaratory relief based on HCSC's use of out-of-network adverse benefit determinations undisclosed and unauthorized by Evidences of Coverage and group health plan summary documents;

C.     Declaring that HCSC has breached the terms of HCSC member Evidences of Coverage and group health plan summary documents by lowering reimbursement in the undisclosed and unauthorized ways detailed herein, and awarding declaratory and injunctive relief to remedy such breaches;

D.     Awarding Plaintiff the full value of her benefits and such other relief as may be appropriate;

E.     Declaring that HCSC has failed to provide a "full and fair review" to Plaintiff and the Class under ERISA § 503, 29 U.S.C. § 1133, and awarding compensatory, injunctive,

declaratory and other equitable relief to Plaintiff and the Class to ensure compliance with ERISA and ERISA regulations;

F.       Declaring that HCSC has violated its disclosure obligations under ERISA, including under § 104(b)(4), 29 U.S.C. § 1024(b)(4) and ERISA § 102, 29 U.S.C. § 1022, for which Plaintiff and the Class are entitled to statutory penalties, injunctive, declaratory and other equitable relief;

G.       Preliminarily and permanently enjoining HCSC from using the Ingenix databases, or from making UCR determinations in the absence of valid and reliable data substantiating the lesser-adjudicated claims amounts;

H.       Preliminarily and permanently enjoining HCSC from using or causing others to use outdated Ingenix data in connection with payment of out-of-network benefit claims by HCSC members;

I.       Preliminarily and permanently enjoining HCSC from applying out-of-network adverse benefit determinations where the HCSC members' Evidences of Coverage and group health plan summary documents do not disclose or authorize them;

J.       Preliminarily and permanently enjoining HCSC from discouraging appeals and/or deciding appeals in a manner inconsistent with federal and state law;

K.       Preliminary and permanently enjoining HCSC from discouraging out-of-network care or placing undisclosed obstacles in the path of HCSC members seeking to access out-of-network care;

L.       Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

M.    Awarding interest from date of initial out-of-network adverse benefit determinations on all unpaid amounts[2];

N.    Awarding prejudgment interest; and

O.    Granting such other and further relief as is just and proper.

DATED:  June 30, 2009

/s/ Elizabeth Hoskins Dow

Elizabeth Hoskins Dow, #6216262
Bailey & Glasser, LLP
1003 Western Avenue
Joliet, IL 60435
(815)740-4034
Email: ldow@baileyglasser.com

Brian A. Glasser (*to be admitted pro hac vice*)
Michael L. Murphy (*to be admitted pro hac vice*)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV  25301

Gregory Y. Porter (*to be admitted pro hac vice*)
Bailey & Glasser LLP
910 17th Street, NW
Suite 800
Washington, DC 20006

Todd M. Schneider (*admitted pro hac vice*)
Schneider Wallace Cottrell Brayton Konecky LLP
180 Montgomery Street, Suite 2000
San Francisco, California  94104

Garrett W. Wotkyns (*admitted pro hac vice*)
Mark T. Johnson (*admitted pro hac vice*)
Schneider Wallace Cottrell Brayton Konecky LLP
7702 E. Doubletree Ranch Road, Suite 300
Scottsdale, Arizona  85258

---

[2] To the extent that interest on Plaintiff's and the Class' wrongfully denied benefit claims is not permitted under section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Plaintiff seeks recovery of such interest pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

Edwin R. Lamberth (*to be admitted pro hac vice*)
Steven L. Nicholas (*to be admitted pro hac vice*)
Cunningham Bounds, LLC
1601 Dauphin Street
Mobile, AL 36604

Andrew S. Friedman (*admitted pro hac vice*)
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona  85012

Mark A. Chavez (*admitted pro hac vice*)
Nance Becker (*admitted pro hac vice*)
Jonathan E. Gertler (*to be admitted pro hac vice*)
Chavez & Gertler LLP
42 Miller Avenue
Mill Valley, California  94941

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

PLAINTIFF JUSTINE L., on Behalf of    )   Case No.: 1:09-cv-01588
Herself and All Others Similarly Situated,   )
                                              )
                                              )
                  Plaintiff,       )
                                              )
        vs.                             )
HEALTH CARE SERVICE          )
CORPORATION,                  )
                                              )
                  Defendant.      )
                                              )
                                              )
                                              )
_____ )

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that the First Amended Complaint was served upon counsel via the Court's CM/ECF electronic filing system on the 30<u>th</u> day of June, 2009, as follows:

                            Michael A. Pope
                            Christopher M. Murphy
                            Marie A. Halpin
                            John A. Litwinski
                            McDermott Will & Emery
                            227 W. Monroe Street
                            Chicago, Illinois 60606

                            /s/ Elizabeth Hoskins Dow
                            Elizabeth Hoskins Dow